UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASTEROPE SHIPPING CO. LTD, | 24-cv-00962 (JSR) |
| Plaintiff, | OPINION AND ORDER |
| -v- | |
| CSC SUGAR LLC, | |
| Defendant. | |

JED S. RAKOFF, U.S.D.J.:

Petitioner Asterope Shipping Co. Ltd. ("Asterope") brought this equitable action to stay and then permanently enjoin respondent CSC Sugar LLC ("CSC") from proceeding with a New York arbitration commenced by CSC. (Dkt. 1). Asterope also seeks a declaration that Asterope has no obligation to arbitrate any disputes with CSC. CSC filed a cross-petition to compel arbitration, as well as opposing the stay and declaratory relief sought by Asterope. (Dkt. 13). After this Court conducted an evidentiary hearing on September 24, 2024, the parties submitted a supplemental round of briefing (Dkts. 26 & 27). The Court hereby grants Asterope's petition for the reasons set forth in this Opinion.

I.   **Background**

Underlying the New York arbitration, and this action, is an accident on a vessel owned by Asterope, the M/V ST. PAUL (the "vessel"), which CSC chartered to deliver refined sugar from a

Brazilian sugar mill/shipper, CRV Industrial Ltda ("CRV Industrial"), to a port in Brownsville, Texas, pursuant to the terms of a charter party between CSC and another party (sometimes referred to as the "disponent owner" of the ship), named Norvic Shipping International Ltd ("Norvic"). See Norvic-CSC Charter Party, Louloudis Declaration ¶¶ 11-19 & Ex.1 (Dkts. 15, 15-1) ("Louloudis Decl."). "A 'charter party' is a contract by which a ship or part thereof is leased to a merchant. The term also refers to the instrument that establishes the terms and conditions of the charter." Continental Ins. Co. v. Polish S.S. Co., 346 F.3d 281, 282 n. 2 (2d Cir.2003).

Unbeknownst to CSC at the time of the voyage, Asterope first chartered the vessel to an intermediary, Bainbridge Navigation Pte. Ltd. ("Bainbridge"), which then chartered it to Norvic, which finally chartered it to respondent CSC. Louloudis Decl. ¶ 12. Before the vessel set sail and after the sugar was loaded onto the vessel on June 22, 2023, a local agent, Williams (Serviços Maritimos) Ltda ("Williams Serviços"), issued a "bill of lading," which is "a document normally issued by the shipowner when goods are loaded on its ship, and may, depending on the circumstances, serve as a receipt, a document of title, a contract for the carriage of goods, or all of the above." Asoma Corp. v. SK Shipping Co., Ltd., 467 F.3d 817, 823 (2d Cir.2006). The bill of lading was issued on a standard "CONGENBILL" form (not drafted by any party here), which, as it stated, "INCORPOATE[D] ALL TERMS, CONDITIONS, EXCEPTIONS AND ARBITRATION CLAUSE OF CHARTER PARTY DATED FEBRUARY 1, 2023[.]" Id., Ex. 6 at 1 (Dkt. 15-6). The other side

of the form enumerating the "Conditions of Carriage" reflected that "[a]ll terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the[] Law and arbitration clause, are herewith incorporated." Id., Ex. 6 at 2. The face of the bill of lading identified the Brazilian sugar mill (CRV Industrial) as the "Shipper" and CSC as the "Notify party." At the bottom front page, Williams Serviços signed the bill of lading "[a]s agents only" "[f]or and on behalf of the Master M/V ST. PAUL Capt. YURIY SUBIN[.]"

The bill of lading was, in turn, issued pursuant to an "authorization letter to agents to sign bills of lading" issued by the vessel's Master to Williams Serviços on the same day. Id., Ex. 4 at 1 (Dkt. 15-4). In relevant part, the authorization letter read:

> On behalf of my Owners, I authorize you to sign on my behalf[] the Bills of Lading covering the cargo actually loaded onboard this vessel at this port and during her present call only.

Id.

The authorization letter was "issued strictly and subject" to three conditions, the third and most pertinent to this dispute being that "all Bills of Lading" signed by Williams Serviços had to contain, as was the case in the bill of lading at issue here, the following clause: "All terms, conditions, liberties and exceptions of the Charter Party dated 01st of February, 2023 are herewith incorporated." The letter further stated that the "letter [was] intended to complement the Charter Party and [had to] be applied in conjunction with the relevant provisions contained therein." Id. The Master of the vessel

signed the letter and stamped it with a stamp bearing the vessel's name — "MV ST. PAUL" — and the company's name, "Asterope Shipping Co Ltd." Id.

The Norvic-CSC Charter Party, concluded on February 1, 2023, in turn, contained an arbitration clause as follows:

> Arbitration. That should any dispute arise between owners and charterers, the matter in dispute shall be referred to three persons at New York (general US maritime law to apply), one to be appointed by each of the parties hereto and the third by the two so chosen; their decision or that of any two of them, shall be final and for the purpose of enforcing any award, this agreement may be made a rule of the court. The arbitrators shall be commercial men. Any arbitration shall be conducted in accordance with the Society of Maritime Arbitrators, Inc. (SMA) rules. SMA arbitration clause with shortened arbitration procedure currently in place to apply for all claims less than $50,000.

Louloudis Decl., Ex.1 at 7.

However, the so-called "fixture recap" to the charter party contained another arbitration clause. "A fixture recap is understood in the industry to be a recapitulation of the main terms that had been agreed upon in the negotiation of a charter party" and is ordinarily negotiated by brokers. Great Circle Lines Ltd. v. Matheson & Co., 681 F.2d 121, 123 (2d Cir.1992).[1] The fixture here was "clean," meaning

---

[1] Charter parties are generally negotiated in two stages. The first stage involves negotiation by brokers over the "main" terms of the charter party, which include "the name of the charterer, name of owner, ship and its characteristics, time and place of delivery, duration of charter, place of redelivery, hire rate, printed form upon which the contract is based, and any other term that a party deems important." Great Circle Lines, Ltd. v. Matheson & Co., 681 F.2d 121, 125 (2d Cir. 1982). The written statement of the agreed-upon "main" terms is usually called a fixture. Id. After the main terms are finalized, the parties continue to flesh out the details to be included

that there were "no preconditions or subjects, and the Charter Party was fully concluded." Declaration of Brendan M. Dillon ¶ 5 (Dkt. 21). The fixture recap, also dated February 1, 2023, relating to the February 1, 2023, charter party and identifying as "Charterer" CSC Sugar LLC and as "Owner" Norvic Shipping International Ltd or Norvic Shipping Asia PTE, states in relevant parts:

> ARBITRATION
> -SMA ARBITRATION CLAUSE WITH SHORTENED ARBITRATION PROCESS CURRENTLY IN PLACE TO APPLY FOR ALL CLAIMS LESS THAN $50,000.00. GENERAL U.S. MARITIME LAW TO APPLY.

Louloudis Decl., Ex. 2 at 11.

Directly underneath the arbitration clause, the fixture states in regard to "CP" (meaning "charter party") that "OTHERWISE AS PER MV NIMERTIS / CSC SUGAR CP DTD JUNE 19, 2019 WITH LOGICAL ALTERATIONS IN ACCORDANCE WITH MAIN TERMS AGREED." Id. This refers to a different charter party negotiated by CSC.

Asterope's vessel ST PAUL was ultimately nominated to perform the voyage reflected in the Norvic-CSC Charter Party. September 24, 2024, Hearing Transcript 11:1-9 ("Tr."). With the sugar aboard, the vessel then sailed to a port in Texas, where the vessel's hoisting cables snapped during unloading, causing a spreader bar with 19.2 metric tons of sugar to collapse on a truck beneath it. Louloudis Decl. ¶ 19. Additionally, shards of rusty steel were sprayed from the snapped

---

in the original contract. Id. The fixture is considered a binding contract, even when the minor, less important terms such as for example fuel used or cargo capacity, are unresolved. Id. at 126.

cable across the vessel's deck and onto approximately 2,395 metric tons of bagged sugar onboard the vessel, which had to be reprocessed and cleaned of any foreign matter at an additional expense before it could be sold to customers. Id.

On November 13, 2023, counsel for CSC sent an email to petitioner demanding arbitration under the bill of lading and the terms of the February 1, 2023, charter party incorporated therein, claiming $87,058.28 in damages, plus interest, attorneys' fees, and costs. Skoufalos Decl. ¶ 4, Ex. C (Dkts. 3, 3-3).[2] Asterope objected to the arbitration panel's jurisdiction, asserting it was "not in privity with CSC, and certainly not a party to the CSC/Norvic Charter Party." Id., ¶ 4, Ex. E (Dkt. 3-5). Asterope then filed the present petition under Sections 3 and 4 of the Federal Arbitration Act ("FAA") to stay the arbitration as well as to enjoin CSC from proceeding with the arbitration, and for a declaration pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a) that Asterope has no obligation to arbitrate any dispute with CSC. In response, CSC filed a cross-petition to compel Asterope to arbitrate and in opposition to Asterope's demand for injunctive and declaratory relief. See Cross-petition

---

[2] CSC has since estimated the total damages, including market loss, to be $1,050,251.31. Louloudis Decl. ¶ 19.

II.  **Legal Standards**

The question of whether parties have submitted a particular dispute to arbitration, _i.e._, the "question of arbitrability," is "an issue for judicial determination[,]" unless "the parties clearly and unmistakably provide otherwise." AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649 (1986). District courts have power to enjoin "arbitration that the court determines is not otherwise valid." In re Am. Express Fin. Advisors Securities Litig., 672 F.3d 113, 140-41 (2d Cir.2011); see also Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co., 643 F.2d 863, 868 (1st Cir. 1981) ("To allow a federal court to enjoin an arbitration proceeding which is not called for by the contract interferes with neither the letter nor the spirit of" the FAA.)

While there exists a strong and "liberal federal policy favoring arbitration agreements," Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 (1985) (quotation omitted), "such agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract." Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995). Simply put, the "FAA does not require parties to arbitrate when they have not agreed to do so[.]" Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989).

"The issue of whether the parties are obliged to arbitrate their dispute therefore breaks down into two questions: '(1) whether the parties have entered into a valid agreement to arbitrate, and, if so,

(2) whether the dispute at issue comes within the scope of the arbitration agreement.'" Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co., 203 F. Supp. 3d 312, 316-17 (S.D.N.Y. 2016) (quoting In re Am. Exp. Fin. Advisors Sec. Litig., 672 F.3d 113, 128 (2d Cir. 2011)). In this regard, this present dispute raises three questions: (1) whether Asterope is a party to the bill of lading; (2) whether the bill of lading incorporates the Norvic-CSC Charter Party; and if so, (3) whether the instant arbitration falls within the applicable arbitration clause therein.

With respect to the first question, federal courts sitting in admiralty recognized several "traditional principles of state law" that can bind non-signatories to the arbitration agreements of others, including, as relevant here, agency and estoppel. Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776-78 (2d Cir. 1995). Federal maritime law "embraces the principles of agency, including the doctrine that an undisclosed principal is bound by the contracts made on his account by an agent acting within his authority." Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir. 1980) (internal citation omitted). Specifically, "[t]he law is well settled, at least in this Circuit, that a master's signature on a bill of lading generally binds the ship owner, making the latter a party to the contract." Cementos Andinos Dominicanos, S.A. v. E. Bulk Shipping S.A., 2006 WL 846551, at *2 (S.D.N.Y. Mar. 29, 2006) (collecting cases). As for the estoppel theory, "the Second Circuit has made clear, the question in analyzing estoppel is not whether the non-signatory has some relationship to the

subject matter of an agreement containing an arbitration provision, but rather whether the benefits the non-signatory receives derive directly from 'the agreement itself.'" Katsoris v. WME IMG, LLC, 237 F. Supp. 3d 92, 109 (S.D.N.Y. Feb. 27, 2017) (citing MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 61 (2d Cir. 2001)).

Regarding the second question, under the law of this Circuit, "a holder of a bill of lading which specifically refers to a charter party and in unmistakable language incorporates the charter party's arbitration section can compel a party to the charter party to arbitrate a dispute which comes within the scope of the arbitration provision[,]" Imp. Exp. Steel Corp. v. Mississippi Valley Barge Line Co., 351 F.2d 503, 506 (2d Cir.1963) (citation omitted), which is necessarily a question of fact.

Third and last, the interpretation of charter parties, bills of lading, and other such documents, is subject to ordinary contract principles of maritime law. Asoma Corp. v. SK Shipping Co., 467 F.3d 817, 823 (2d Cir. 2006).

### III. Discussion

#### a. Whether Asterope is a party to the bill of lading

Initially, Asterope argued before this Court that it could not be compelled to arbitrate under the terms of a contract to which it was not a party. That argument is plainly wrong. In this Circuit, if a charter party's arbitration clause is expressly incorporated into a

bill of lading, as is the case here, non-signatories of the charter party who are linked to that bill through general principles of contract law or agency law may be bound. Shipping Co. v. De Fosse & Tanghe, 199 F.2d 687, 688 (2d Cir.1952). See also Maize Bd. of Republic of South Africa v. M/V Courageous I, 685 F. Supp. 420, 422 (S.D.N.Y. 1988) ("The general rule is that the owner of a vessel is bound by the terms of a bill of lading when it is signed 'for the master' with the authority of the owner."). Here, the Master of the vessel, who signed in Asterope's name, issued an authorization letter requiring any bill of lading issued by the agent to incorporate the terms and conditions (including the arbitration clause) of the February 1, 2023, charter party. There is no question that the Master, as Asterope's agent, can bind Asterope to the terms of the incorporated charter party irrespective of whether Asterope is a party to that contract.

Asterope then re-focused its argument on the Master's alleged lack of authority to bind Asterope based on two different provisions of the "head charter party" between Asterope and Bainbridge, a document which Asterope produced for the first time in its reply brief. Asterope-Bainbridge Charter Party, Declaration of Nikolaos Michas, Ex. A (Dkt. 19-1) ("Michas Decl."). First, Asterope argued that the head charter party's indemnification clause should be interpreted to restrict the Master's authority. See 2 Thomas J. Schoenbaum, Admiralty & Maritime Law § 11-7 (6th ed. 2023) ("A contract of carriage with an owner may be entered into either directly between the parties or under a charterer's authority to bind the owner by signing bills' for the

master.' . . . If it is shown . . . that the signature 'for the master' was without the authority of the shipowner, the latter is not personally bound[.]"). Section 36(a) of the Asterope-Bainbridge charter party posits in relevant part that "[t]he Charterer shall indemnify the owners for all consequences and liabilities which may arise as a result of differences between this Charterparty. . . and any bills of lading." Michas Decl., Ex. A at 3 § 36(a). In its supplemental briefing, Asterope argued that the Master was not authorized to bind Asterope in the contract by pointing to Section 8 of the head charter party, which states:

> The Captain (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, ~~and~~ tally, trim, secure and discharge the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading, for cargo as presented, in conformity with Mate's ~~or Tally Clerk's~~ receipt.

Michas Decl., Ex. A at 3 § 8 (strikethrough in the original).

This argument fails. To begin with, the indemnification clause has no bearing on whether the Master of the vessel who stamped the authorization letter with Asterope's name was authorized to act on Asterope's behalf. The clause merely sets out the consequences of a signature by a charterer who did not sign the bill of lading at issue here. Second, Asterope heavily relies on <u>Yeramex Int'l v. S.S. Tendo</u>, 595 F.2d 943 (4th Cir.1979), but that case is distinguishable. In <u>Yeramex</u>, the court held that the charterer, not the owner, was liable for damages because, unlike here, the bill of lading was issued on the

time charterer's form and explicitly stated that the contract was between that charterer and another party. Id. at 945. Further, in reaching this conclusion, the court in Yeramex relied on a finding that the charterer "assumed exclusive responsibility for handling of cargo and for issuance of bills of lading[,]" and not solely on the indemnification clause. Id. at 948. Here, the charterer neither assumed exclusive authority to sign the bills of lading nor had, in fact, signed the bill of lading. On the contrary, Section 36(a), addressing "Bills of Lading," requires "Master and Owners," to first "authorise Charterers and/or their Agents to sign Bills of Lading for and on behalf of the Master," meaning that the charterer did not automatically assume *exclusive* responsibility for issuing bills of lading on Master's behalf:

> Notwithstanding the provisions of Clause 8, Master and Owners to authorise Charterers and/or their Agents to sign Bills of Lading for and on behalf of the Master but always in strict conformity with the Mates and Tally receipts.

Michas Decl., Ex. A at 3 § 36(a).

The fixture recap to the charter party then re-stated that "ORDINARILY, BILLS OF LADING SHALL BE ISSUED, STAMPED, AND SIGNED BY THE MASTER[,]" but that charterers were authorized to signed on Master's behalf as well. Michas Decl., Ex. A at 42. Accordingly, the bill of lading was signed by Serviços Maritimos, the Brazilian agent, "as agents only" "[f]or and on behalf of the Master M/V ST. PAUL Capt. YURIY SUBIN," and not by the charterer or its agents. Louloudis Decl., Ex. 6 at 2. Instead, the local agent signed the bill of lading pursuant

to the authorization letter issued by the vessel's Master, "[o]n behalf of [his] Owners," under a stamp bearing Asterope's name — Asterope Shipping Co Ltd. — and the vessel's name, "ST. PAUL." Id. The Master's signature rendered on behalf of Asterope, as permitted by the charter party, thus bound Asterope to the terms of the bill of lading.

Another non-binding, out-of-circuit case cited by Asterope, Pacific Employers Ins. Co. v. M/V Gloria, did not even contain an indemnification clause, making it distinguishable, 767 F.2d 229 (5th Cir. 1985). And in any case, consistent with this Court's finding, the Fifth Circuit, relying on Yeramex, later held that the indemnity provision, by itself, does not "relieve the vessel owner of liability to the shipper." Thyssen Steel Co. v. M/V Kavo Yerakas, 50 F.3d 1349, 1352-53 (5th Cir. 1995), as amended on denial of reh'g (May 31, 1995) (noting that "a provision in a contract of carriage that purports to relieve a party of [Carriage of Goods by Sea Act] liability is expressly void under the Act.").[3]

Asterope next argues that Section 8, a standard charter-party clause, made the Master the charterer's agent for all purposes. Not in this Circuit. In a long-standing precedent, Judge Friendly held that all this clause means is that the Master "may be acting either

_____

[3] Another non-binding Fifth Circuit decision in The Rice Co. (Suisse), S.A. v. Precious Flowers Ltd., is likewise distinguishable, and in any case not binding on this Court, because the bill of lading in that case was signed by two charterers, and not by a charterer and the vessel's Master, signing himself in the owner's name, 523 F.3d 528, 534-35 (5th Cir. 2008).

on behalf of the owner or the charterer when he actively intervenes in the stowage process." Nichimen Co. v. M. V. Farland, 462 F.2d 319, 332 (2d Cir. 1972) (emphasis added). This clause, by itself, does not make the Master an agent of charterers for the purposes of the bill of lading. Further, the clause is irrelevant to the present case because the parties do not allege that the cargo damage occurred due to the Captain's negligence. Instead, the damage here occurred due to the vessel's condition and maintenance, referred to as "seaworthiness," which is traditionally understood as "the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes." McAllister Lighterage Line v. Ins. Co., 244 F.2d 867, 870 (2d Cir. 1957) (citing The Silvia, 171 U.S. 462, 465 (1898)). As it has been the law for centuries, the ship owner remains liable for its seaworthiness unless otherwise specified in a contract. Martin v. Southwark, 191 U.S. 1, 5-6 (1903) (citation omitted). Accordingly, "[i]f cargo damage were to occur because of some defect in the vessel which the Captain had failed to discover and correct, primary liability would rest with the owner; the cause of the damage would not be within the scope of the responsibilities which clause 8 was intended to shift from the owner to the charterer." McAllister, 244 F.2d at 332.[4]

_____

    [4] As an alternative theory, non-essential to this Court's holding, CSC argues that Asterope should be estopped from denying that it is not bound by the terms of the bill of lading because the bill of lading was issued under the Master's authorization acting on behalf of Asterope and because Asterope received a "direct benefit" from the contract. See Trina Solar US, Inc. v. Jasmin Solar Pty Ltd, 954 F.3d

In short, Asterope is bound by the bill of lading.

> **b. Whether the bill of lading incorporates the February 1,
> 2023, charter party.**

Asterope next argues that the Norvic-CSC charter party terms and
the arbitration clause therein are not incorporated by reference
because the incorporation terms are not specific enough. The bill of
lading (and the authorization letter under which it was issued) clearly
"INCORPORATES ALL TERMS, CONDITIONS, EXCEPTIONS AND ARBITRATION CLAUSE
OF CHARTER PARTY DATED FEBRUARY 1, 2023," Louloudis Decl., Ex. 6 at
1,[5] the date of the Norvic-CSC Charter Party. Id., Ex. 1 at 1. Asterope
argues that because it was a non-signatory to the February 1, 2023,
charter party, that fact, by itself, created confusion. Dkt. 18 at 11.
However, Asterope's non-party status vis-à-vis the Norvic-CSC charter
party is irrelevant "because, as a negotiable instrument, the bill of

---

567, 572-73 (2d Cir. 2020). But to be equitably estopped, Asterope
would have to "knowingly accept the benefits" of the Norvic-CSC charter
party, meaning the transport of sugar on its vessel, which is
unsupported by the evidence here. See MAG Portfolio Consult, GMBH v.
Merlin Biomed Group, LLC, 268 F.3d 58, 61 (2d Cir.2001) (citation
omitted). Instead, Asterope's benefit was only indirect because the
vessel in this case was sub-chartered by two intermediary companies
(Bainbridge and Norvic). For that reason, Asterope cannot be equitably
estopped from denying that it was bound to the terms of the bill of
lading. Cf. MAG Portfolio Consult, GMBH v. Merlin Biomed Group, LLC,
268 F.3d at 61 ("The benefits must be direct—which is to say, flowing
directly from the agreement.") (citation omitted).

   [5] The authorization letter requires the agents, inter alia, to
issue the following to bills of lading issued thereunder: "All terms,
conditions, liberties and exceptions of the Charter Party dated 01st
of February, 20231 are herewith incorporated." Louloudis Decl., Ex. 4
at 1.

lading passes into the hands of those who have nothing to do with the charter party, and may not be bound to an agreement of whose terms they have no knowledge or even notice." <u>Amoco Overseas Co. v. S.T. Avenger</u>, 387 F.Supp. 589, 593 (S.D.N.Y. 1975).

Instead, the relevant inquiry is whether the "unmistakable language" of the bill of lading incorporates a particular charter party. <u>Import Export Steel Corp. v. Mississippi Valley Barge Line Co.</u>, 351 F.2d 503, 506 (2d Cir. 1965). The Court does not find it difficult to conclude that the Norvic-CSC charter party was incorporated by reference in the terms of the bill of lading at issue here. Generally, the courts in this district have found that a bill of lading incorporates a given charter party if it refers to a charter party by a particular date or to the signatories of a charter party. <u>See, e.g.</u>, <u>MacSteel Int'l USA Corp. v. M/V Jag Rani</u>, 2003 WL 22241785, at *12-13 (S.D.N.Y. Sept. 29, 2003) (collecting cases). Conversely, courts have rejected the concept of incorporation in cases where the charter party is virtually unidentifiable, such as when the space provided in the bill of lading for the name and the date of the charter party is blank or filled with a generic idiom. <u>Id.</u>

Here, the date of the charter party on the bill of lading, February 1, 2023, aligns with the date of the Norvic-CSC charter party, which was concluded just a few months before the bill of lading issued. There was no evidence submitted on the record showing, for example, that there were multiple charter parties with the same date, which

could have created confusion.[6] Thus, "where there is 'no confusion
whatsoever concerning who was the charterer on this voyage, or which
charter party governed the rights of the charterer vis-a-vis the
shipowner,' an incorporation clause may affect incorporation even
though it does not contain the names of the signatories or the date
or place of the making of the charter party." State Trading Corp. of
India v. Grunstad Shipping Corp., 582 F.Supp. 1523, 1524
(S.D.N.Y.), aff'd 751 F.2d 371 (2d Cir.1984).

> c. **Whether the ongoing arbitration is within the scope of
> the arbitration clause.**

Notwithstanding the fact that Asterope is bound by the bill of
lading and that the bill of lading picks up the terms of the Norvic-
CSC charter party, the question remains whether the instant ongoing
arbitration is either of the arbitrations authorized by that charter
party. In this regard, CSC raises two arguments: (1) that the
arbitration clause in the fixture recap incorporates by reference the
Society of Maritime Arbitrators ("SMA") model clause that covers the
arbitration here; or, in any case (2) that the arbitration clause in
the Norvic-CSC charter party is broad enough to encompass the present
dispute.

---

[6] In fact, in a declaration submitted in support of the
petitioner's petition, the vessel's Operation Manager stated upon
reviewing the bill of lading at issue that "any bills of lading must
reference the 1 February 2023 charter agreement between Norvic and CSC
Sugar." Michas Decl. ¶ 15.

The charter party requires arbitration of "any dispute [that] arise[s] between owners and charterers[.]" Louloudis Decl., Ex.1 at 7. See Import Export Steel Corp. v. Mississippi Valley Barge Line Co., 351 F.2d 503, 505 (2d Cir. 1965). While the terms "owners and charterers" are undefined, the singular "Owner" and "Charterer" are defined as "Norvic" and "CSC" respectively on the first page of the Norvic-CSC charter party. Id., Ex.1 at 1. Thus, the arbitration with Asterope is not covered.

Initially, CSC argued, unpersuasively, that the discrepancy between the singular and plural forms renders the clause sufficiently ambiguous to extend to Asterope and thus to compel arbitration. Respondent's Cross-Petition at 16-17 (Dkt. 17). This is contrary to established precedent. See, e.g., Imp. Exp. Steel Corp. v. Mississippi Valley Barge Line Co., 351 F.2d 503, 506 (2d Cir. 1965) (finding that it would be "unduly stretching the language of [the] arbitration clause to say" that a non-charter party "is one of the 'Disponent Owners' or 'Charterers'"). Moreover, at the hearing convened by the Court, after the ordered briefing, CSC's own witness who negotiated the agreement admitted that "owners and charterers" refer only to the charter parties – Norvic and CSC. Tr. 7:14-8:4. The charter party arbitration clause thus does not bind Asterope to arbitrate the present dispute.

CSC next argues that the arbitration clause in the "fixture recap" governs instead and that that clause incorporates the SMA model clause

with so-called "broad" language encompassing non-parties.[7] The trouble with respondent's argument is that the fixture clause does not unambiguously refer to the SMA model arbitration clause and, further, that it is duplicative of the last sentence in the existing charter party clause. The arbitration clause in the fixture reads:

> ARBITRATION
> SMA ARBITRATION CLAUSE WITH SHORTENED ARBITRATION PROCEDURE CURRENTLY IN PLACE TO APPLY FOR ALL CLAIMS LESS THAN $50,000.00[8]
>
> Louloudis Decl., Ex. 4 at 11.

CSC argues that the Court should, in effect, interpret the clause as "SMA [MODEL] ARBITRATION CLAUSE [TO APPLY FOR ALL CLAIMS OVER $50,000.00 AND] SHORTENED ARBITRATION CURRENTLY IN PLACE TO APPLY FOR ALL CLAIMS LESS THAN $50,000.00." So interpreted, the first half of the clause before "and" would then incorporate by reference the wording of the SMA model arbitration clause, which applies to "any dispute

---

[7] Typically, courts in this Circuit have distinguished between "broad" arbitration clause applicable to "all disputes" arising under the charter party and "narrow" ones governing disputes only between the parties identified in that clause. See, e.g., Lowry & Co. v. S.S. Le Moyne D'Iberville, 253 F. Supp. 396, 398 (S.D.N.Y. March 29, 1966) (collecting cases).

[8] Compare with the last sentence of the arbitration clause in the Norvic-CSC charter party, which states that: [S]hould any dispute arise between owners and charterers, the matter in dispute shall be referred to three persons at New York (general US maritime law to apply), one to be appointed by each of the parties hereto and the third by the two so chosen; their decision or that of any two of them, shall be final and for the purpose of enforcing any award, this agreement may be made a rule of the court. The arbitrators shall be commercial men. Any arbitration shall be conducted in accordance with the Society of Maritime Arbitrators, Inc. (SMA) rules. SMA arbitration clause with shortened arbitration procedure currently in place to apply for all claims less than $50,000. Louloudis Decl., Ex.1 at 7.

aris[ing] out of [a given] contract," Louloudis Decl. ¶ 9, because
that was the wording the parties allegedly agreed to. Tr. 18:8-19:2.

In response, Asterope offers a more persuasive argument that
aligns with the plain text of the fixture's arbitration clause and
that gives meaning to the same language in the charter party. "In
reviewing a written contract" such as the fixture recap and the
arbitration clause included therein, the Court's "primary objective
is to give effect to the intent of the parties as revealed by the
language they chose to use." Seiden Associates, Inc. v. ANC Holdings,
Inc., 959 F.2d 425, 428 (2d Cir.1992). The Court finds that the "SMA
arbitration clause with shortened arbitration procedure" refers to the
SMA shortened arbitration model clause, which governs disputes not to
exceed a certain sum of dollars agreed by the parties and which applies
the SMA's shortened arbitration procedure.[9] The ordinary meaning of
"with" is "accompanied by" or "in opposition to,"[10] meaning that the
SMA arbitration must be accompanied by the shortened procedure. This
interpretation also gives effect to all words in the arbitration

---

[9] SMA's shortened arbitration reads: "[n]otwithstanding anything
contained herein to the contrary, should the sum claimed by each party
not exceed U.S. $_____ (insert amount, exclusive of interest on
the sum claimed, costs of the arbitration, and legal expenses), the
dispute is to be governed by the 'Shortened Arbitration Procedure' of
the Society of Maritime Arbitrators, Inc. (SMA) of New York, as defined
in the Society's current Rules for such procedure, copy of which is
attached hereto." Declaration of James D. Kleiner, Ex. 5 (Dkt. 22-5).

[10] *With*, Dictionary.com, https://www.dictionary.com/browse/with
(last visited October 17, 2024); *with* Merriam-Webster Dictionary,
https://www.merriam-webster.com/dictionary/with (last visited October
17, 2024).

charter party. CSC's reading of the clause to encompass both the SMA model clause and the model clause with the shortened procedure for claims below $50,000 would make the beginning half of the arbitration clause applying to "owners and charterers" superfluous. As in other areas of law, federal courts sitting in admiralty adhere to the axiom of statutory interpretation that "a contract should be interpreted to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." Mannesman Demag Corp. v. M/V CONCERT EXPRESS, 225 F.3d 587, 594 (5th Cir. 2000) (internal quotation marks and citation omitted). Further, interpreting a contract that would render one or more clauses superfluous would "conflict with the presumption that parties to a contract intend every clause to have some effect." City of Hartford v. Chase, 942 F.2d 130, 135 (2d Cir.1991) (internal quotation marks and citation omitted).

In conclusion, this Court finds that the most reasonable interpretation of the fixture interprets it harmoniously with the charter party, which contains the same language, thus giving effect to all provisions. The arbitration clause in the fixture recap refers to SMA arbitration with a shortened procedure and only applies to disputes under $50,000. Disputes above $50,000, such as the dispute at issue in this case, are accordingly covered by the Norvic-CSC's charter party arbitration clause, which is restricted to "owners and

charterers."[11]  Asterope  is  neither  under  the  charter  party's definitions.

For the foregoing reasons, the arbitration is hereby enjoined, and the relief sought by petitioners is hereby granted in all respects. The Clerk of the Court is respectfully directed to enter judgment and close the case.


SO ORDERED.

New York, NY
November 6, 2024                          _____
                                          JED S. RAKOFF, U.S.D.J.

_____

[11]  The  harmonious  interpretation  is  also  consistent  with  the fixture's demand that the terms of the standard charter party be "logical[ly]  alter[ed]  in  accordance  with  main  terms  agreed." Louloudis Decl., Ex. 2 at 11. It would not be logical to replace the clear words of the charter party with an ambiguous wording of the fixture that neither unambiguously references the broad SMA model arbitration clause, nor applies to disputes over $50,000. If the parties wanted the SMA clause to apply to all disputes, they could have done so by: (1) unambiguously incorporating the SMA model clause in the fixture, or (2) integrating the desired language in the charter party. They have done neither. This Court cannot re-write the parties' freely negotiated contract.